JUDE G. GRAVOIS, Judge.
|2After being convicted of aggravated incest, defendant, Frankie Baskin, was adjudicated a fourth felony offender and was sentenced to 75 years imprisonment at hard labor. He has appealed both his underlying conviction and his habitual offender adjudication. For the reasons that follow, we affirm defendant’s conviction and habitual offender adjudication, amend his sentence, affirm the sentence as amended, and remand with instructions.

FACTS

At trial, the 16-year-old victim, C.C.,[1] testified that she first met defendant, who is her biological father, when she was seven years old. When C.C. was eight years old, she lived with defendant in Westwego. She went back to live with her mother in LaPlace when she was nine years old. Her family then lived in | aTennessee until shortly after C.C.’s twelfth birthday. When the family returned to Louisiana in January, 2008, they lived "with C.C.’s ma *616 ternal aunt. However, in February of 2008, since her aunt did not have enough room to accommodate the entire family, C.C. went to live with defendant and his sister in LaPlace. In May of 2008, C.C. moved back with her mother. C.C. testified that after living in LaPlace, defendant moved to a hotel in Metairie, in Jefferson Parish, where she visited him and spent the night “a couple of times.” When C.C. was in eighth grade, defendant was living in Waggaman, also in Jefferson Parish. While she was in eighth grade, defendant moved to New Orleans, where C.C. stayed with him on occasion.
C.C. testified that in February of 2008, defendant began to “touch” her. The first time this happened, she awoke and defendant was on top of her, putting his penis inside her vagina. After this act, he went to sleep, and she cried herself to sleep. Defendant warned C.C. that if she told anyone about this incident, he would go to jail. C.C. testified that defendant raped her repeatedly over the next two years at the hotel in Metairie, at the home in Wag-gaman, and in New Orleans. Defendant made C.C. watch pornographic movies when the rapes took place.
In June of 2010, C.C. had difficulty walking due to pain in her leg and pelvic area. Her mother took her to a pediatrician, and after an ultrasound was performed, it was discovered that she was pregnant. C.C. explained that before the pregnancy was discovered, she had never told anyone that defendant was having sex with her.
After the pregnancy was discovered, an obstetrician was consulted, and C.C. was advised to immediately go to the hospital, where she had an emergency Caesarian section to deliver the infant. When she woke up in her room after the section, she was told that her baby boy had died shortly after birth.
K.C., C.C.’s mother, testified that defendant is the biological father of C.C. K.C. and defendant had a purely sexual relationship, which resulted in C.C.’s ^conception; however, defendant did not learn about C.C. until C.C. was two years old. Defendant saw C.C. sporadically until C.C. was approximately nine years old, at which time she went to live with him for several months. Thereafter, K.C. and C.C. moved to Tennessee, returning to Louisiana on January 12, 2008. C.C. lived with defendant and his sister in LaPlace from approximately February to May of 2008, while C.C. was in the sixth grade. After that time, defendant moved to a motel in Metairie, where K.C. would bring C.C. to visit defendant. When defendant moved in with his sister in Waggaman, K.C. brought C.C. to visit defendant there as well. K.C. explained that she never suspected any type of abuse was taking place, and felt it was important that C.C. had the opportunity to get to know her father’s family.
In 2009, C.C. turned 14 years old and K.C. continued bringing her to visit defendant, who was living in New Orleans at that time. The last time K.C. took C.C. to visit defendant was in February of 2010, while he was living in New Orleans.
K.C. said that she learned of C.C.’s pregnancy in June 2010 after taking her to a pediatrician following a complaint of pelvic area pain. C.C. did not want to identify the father of her baby. K.C. convinced C.C. to write the father’s name down and C.C. wrote “My D-A-D.” C.C. was put into the hospital where the infant died shortly after an emergency Caesarian section was performed. K.C. identified defendant in open court.
Dr. Ann Chau was accepted by the court as an expert in the field of maternal/fetal medicine. Dr. Chau was consulted to treat *617 C.C. in June of 2010, after 14-year-old C.C. was found to be pregnant. Dr. Chau testified that C.C. appeared to be scared, quiet, and frightened. Because of C.C.’s young age, | ¡¡Dr. Chau asked her questions about her sexual activity. At that time, C.C. disclosed to Dr. Chau that she was pregnant after being raped by her father.
Based on the medical condition of the baby and the health of the mother, an immediate Cesarean section was recommended, and the infant was delivered on June 15, 2010. According to Dr. Chau, the baby boy was born alive, but passed away shortly thereafter due to a lack of lung development.[2]
Detective Cynthia Durham, who is employed by the Jefferson Parish Sheriffs Office in the Personal Violence Section, testified that she was assigned to investigate this case after K.C. filed a police report. She began her investigation by obtaining background information on C.C., K.C., and defendant. She also interviewed C.C. and K.C. and contacted law enforcement agencies in Orleans and St. John the Baptist Parishes regarding ongoing investigations of defendant. Detective Durham recounted that when she interviewed C.C., she was “withdrawn, sad” and “had a difficult time articulating ... what had occurred.” In the course of her investigation, Detective Durham confirmed that allegations of abuse against defendant stemmed in part from incidents alleged to have occurred in Waggaman on Jasmine Street and in a motel on Airline Highway, locations within Jefferson Parish. Detective Durham was present for the interview that C.C. had at the Jefferson Parish Child Advocacy Center.
After obtaining information about the allegations against defendant, Detective Durham sought to obtain buccal swabs to verify that defendant was the biological father of the infant. Swabs were obtained from C.C., the deceased infant, defendant, and K.C.
IfiDetective Christie Chauvin of the St. John the Baptist Sheriffs Office, Criminal Investigations Division, began an investigation in June of 2010 into allegations of sexual abuse made against defendant. The case came to the attention of the Sheriffs Office through notification by the Office of Community Services, after C.C. gave birth. Detective Chauvin learned from interviewing C.C. that she was orally and vaginally raped by defendant in St. John the Baptist Parish from February to May of 2008. An arrest warrant was issued for defendant; he was arrested and Detective Chauvin interviewed him. During this interview, which was not recorded, defendant denied raping C.C. He “mainly wanted to discuss” his music career and his travels.
Bonnie Dubourg, a forensic DNA analyst for the Jefferson Parish Sheriff’s Office, was accepted by the court as an expert in the field of forensic DNA analysis. After analyzing buccal swabs from the deceased infant, C.C., defendant, and K.C., Ms. Dubourg compiled a report dated July 10, 2012. Based upon the genetic profiles of all four swabs, Ms. Dubourg concluded that the relative probability that defendant was the father of the deceased infant was 99.99%, explaining that defendant was 2.8 billion times more likely to be the father of the infant than another randomly selected black male. She also concluded that the relative probability that defendant was the *618 father of C.C. was also 99.99%, explaining that defendant was 872.5 million times more likely to be the father of C.C. than another randomly selected black male. Ms. Dubourg explained that for paternity, statistics of 100% are not given.
Suzanne Jolissaint, a forensic interviewer at the Jefferson Parish Children’s Advocacy Center (“CAC”), testified that on July 25, 2011, she conducted a videotaped interview of C.C. A recording of this interview was played for the jury. 17Puring the interview, in response to Ms. Jolissaint’s comment that C.C. was there because “something may have happened,” C.C. responded, “My dad raped me.”
Daniel Dooley, a forensic interviewer for the Child Advocacy Center in New Orleans, testified that he conducted a recorded interview with C.C. on June 29, 2010. A recording of this interview, in which C.C. described the abuse, was also played for the jury.
Anne Troy, a forensic nurse practitioner at the Audrey Hepburn Care Center associated with Children’s Hospital in New Orleans, was accepted by the court as an expert in forensic pediatric child abuse. Ms. Troy conducted an examination of C.C. in November of 2010, and prepared a report in conjunction with that examination. This report and a transcript of her interview with C.C. were admitted into evidence and presented to the jury. Ms. Troy explained that the finding of a tran-section of C.C.’s hymen is a positive finding of intimate sexual contact.
After the conclusion of the State’s case, the defense presented the testimony of several witnesses. Vera Sims, defendant’s sister, testified that she has lived in a two bedroom apartment in LaPlace since 1993. Defendant lived with her at the apartment between June and December of 2007. She recalled that C.C. would come and spend nights there. Ms. Sims said that she never witnessed any inappropriate behavior between C.C. and defendant, and that C.C. always appeared to be happy. After defendant moved out of Ms. Sims’ house, he went to Mississippi to play music and then moved into a rental house in Waggaman. She was not aware that defendant had lived in a hotel, nor did she know the date that defendant moved to New Orleans. Ms. Sims never suspected that C.C. had been abused or was pregnant.
Kevin Bussard testified that he lived with defendant’s sister, Shelia, in Wagga-man between 2008 and 2012. Occasionally defendant slept in the back 1 ¡¡bedroom of the home before he went to work playing music. Bussard said that he did not see or have any reason to suspect that defendant was having a sexual relationship with C.C.
Shiela Baskin, defendant’s sister, testified similarly to Kevin Bussard. She stated that she had no reason to suspect that defendant was molesting C.C.
Defendant, Frankie Baskin, took the stand in his own defense, after being advised on the record of his right to remain silent and his option not to testify at trial. Defendant recounted his previous convictions for “cocaine,” simple burglary, and transporting illegal immigrants. He met C.C.’s mother, K.C., “on a bet” and the two had a “sex thing.” K.C. denied that C.C. was his child until C.C. turned seven years old. Upon learning that he was C.C.’s father, defendant flew to Savannah, Georgia, to meet C.C. for the first time. He wanted to establish a father-daughter relationship with her. Later, K.C. asked defendant if he could help take care of C.C.
Defendant returned to New Orleans and K.C. moved to LaPlace in 2008. Before C.C.’s eighth birthday, she moved in with defendant at his brother’s house for a few weeks. Defendant claimed that K.C. came and took C.C. back from him when defen *619 dant would not have sex with K.C. After C.C. turned nine, she stayed with defendant and his girlfriend for the weekend at his apartment in Harvey. C.C. was living with him when Hurricane Katrina struck New Orleans, and they evacuated to Wy-nona, Mississippi. C.C. lived with him until July 8, 2006, at which time he was charged with transporting illegal immigrants. Before surrendering himself to federal prison, he brought C.C. to K.C. in Nashville, Tennessee.
Defendant testified that in 2007, he was living with his sister in LaPlace. Defendant brought C.C. to live with him at K.C.’s request. He obtained temporary 19custody of C.C. and used his sister’s address to enroll C.C. in school. K.C. tried to take C.C. back at that time. Defendant’s sister watched after C.C. while he played music at night. Defendant, C.C., and another one of defendant’s daughters shared a bed together.
Soon thereafter, defendant “went” to Waggaman. He continued to assist K.C. and her children, including C.C., financially. He recognized C.C. as his biological daughter. Later that year, defendant brought C.C. to Waggaman. She stayed at his sister’s house, where they had a bed for her. C.C. was 18 years old at that time. Defendant said that when K.C. came to pick C.C. up, he and K.C. had a “sex thing” because he was “in heat at that time.” Defendant denied that he ever brought C.C. to his house in Waggaman, which was a “FEMA residence.” Defendant said that he does not dispute that C.C. went with him to the various places she identified.
Defendant denied having intercourse with his daughter at the location in La-Place.[3] Defendant then generally denied having sexually abused anyone and stated that no one else had ever accused him of doing so. Defendant also said that C.C. showed no signs of being sexually abused, as she was an honor roll student, and never attempted to avoid defendant.
Defendant could not explain why C.C. identified him as the father of her child. He denied paternity of C.C.’s baby. He stated that he requested to pay for another DNA test but had not received any information as to how to go about doing so. With regard to other charges related to the sexual abuse of C.C. pending against him at the time of trial, defendant testified that he had no pending charges in Orleans Parish, but did have pending charges in St. John the Baptist Parish.
|10On cross-examination, defendant confirmed that C.C. is his daughter. He also confirmed that C.C. was under 18 years old. Defendant stated that C.C. was lying in the taped interviews she gave, which were played for the jury.
At the conclusion of the trial, defendant was found guilty of aggravated incest. He was sentenced to 20 years imprisonment and given a $25,000.00 fine. The State filed a habitual offender bill of information alleging defendant to be a fourth felony offender. After a hearing, the court found defendant to be a fourth felony offender and he was sentenced to 75 years imprisonment.

ASSIGNMENT OF ERROR NO. ONE

Introduction of other “bad acts” evidence

In his first assignment of error, defendant contends that the trial court erred in allowing into evidence other “bad *620 acts” of defendant that were alleged to have occurred in St. John the Baptist and Orleans Parishes. Defendant specifically argues that the evidence did not fit the criteria enumerated in State v. Prieur,[4] and La.C.Cr.P. art. 404(B) or La. C.E. art. 412.2. The record demonstrates, however, that the State only argued the admissibility of the other bad acts pursuant to La. C.E. art. 412.2.
Defendant argues that the separate charges pending from incidents with C.C., that had allegedly occurred in St. John the Baptist and Orleans Parishes, were improperly admitted as prejudicial because they had not yet been proven true at separate, respective trials. Defendant contends that because of the trial court’s ruling that allowed evidence of other crimes to be admitted at his trial, he was forced to defend himself against charges that weré outside the scope of the Jefferson Parish proceedings.
La. C.E. art. 412.2 provides, in relevant part:
|nA. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
The bill of information in this case charged defendant with aggravated incest upon a known juvenile which was alleged to have occurred in Jefferson Parish in 2008. On January 25, 2012, the State filed a “Notice of Intent to Use Evidence of Other Acts of Lustful Disposition and/or Sexually Assaultive Behavior by Defendant upon the Same Minor Victim,” to introduce evidence at trial of the following acts:
1. Defendant repeatedly had vaginal sexual intercourse with the same victim at Defendant’s sister’s house in LaPlace, Louisiana, over a period of months when victim was 12 years old, and also showed her pornography during these events.
2. Defendant repeatedly had vaginal sexual intercourse with the same victim at Defendant’s house at 3081 Laurel Street in Orleans Parish over a period of months when victim was 14 years old, and also showed her pornography during these events.
At the hearing on August 20, 2012, the State argued in support of its motion:
THE STATE:
The conduct that took place in Jefferson Parish that Defendant is charged with occurred approximately from August— excuse me, October 9, 2008, to March 31st of 2010, bookending those events occurring before in St. John were sort of an ongoing sexual abuse. The abuse begins in St. John Parish in 2008 and, then, depending on where the Defendant moves and where the victim has to come stay with Defendant, these acts continue both in Metairie, in Waggaman and then, finally, in Orleans Parish. For the *621 purpose of narrative completeness, as well as the State is entitled to under 412.2, the State 112is seeking the introduction of the total history of this abuse, and I think we’re entitled to under 412.2.
At the conclusion of the hearing, the trial court found that the other alleged incidents of abuse were relevant to show that that there was no absence of mistake, and that defendant had a lustful disposition toward children.
At trial, C.C. testified that she had been raped repeatedly by defendant when she was 12 through 14 years old. C.C. testified that in February of 2008, while she was living in LaPlace with defendant, he began to “touch” her. The first time this occurred, she awoke and defendant was on top of her, putting his penis inside her vagina. Defendant warned C.C. that if she told anyone about the incident, he would go to jail. C.C. testified that defendant raped her repeatedly over the next two years at the hotel where he was staying in Metairie, in Waggaman, and in New Orleans. Defendant made C.C. watch pornographic movies when the rapes took place. Clearly the evidence of rapes occurring in LaPlace and in New Orleans was admissible under La. C.E. art. 412.2.
Further, C.C.’s testimony as to the rapes defendant committed outside of Jefferson Parish was admissible as Louisiana courts have long held that a victim’s testimony about crimes committed against them by the same defendant is admissible in the prosecution of that defendant for another offense.
In State v. Acliese, 403 So.2d 665, 667 (La.1981), the defendant was convicted of forcible rape of an 11-year-old girl. During trial, the victim testified that on at least six occasions during the weeks immediately prior to the offense charged, defendant had either raped or attempted to rape her at her home. She testified that the offenses generally followed the same pattern. Id. at 667. On appeal, defendant argued that the trial judge erred in allowing the introduction of evidence of prior sexual assaults by defendant on the victim to show his lustful 1 ^disposition toward her. In affirming defendant’s conviction, the Louisiana Supreme Court reasoned:
... in a prosecution for the commission of statutory rape, or rape of a female under the age of consent, or an attempt to commit such rape, evidence of prior sex offenses committed by the defendant with the same prosecutrix is generally admissible. Such evidence has been admitted for various reasons, such as corroboration of the offense charged, to show intimate relations between the parties, the lustful disposition of the defendant and the probability of his having committed the offense charged, or to rebut the defense of alibi.
[Citations omitted]
The court concluded, “... that in the instant case evidence of the prior rapes or attempted rapes by defendant” of the victim “was properly admitted in this prosecution for aggravated rape.”
In State v. Kinsel, 00-1610 (La.App. 5 Cir. 3/28/01), 783 So.2d 532, writ denied, 01-1230 (La.3/28/02), 812 So.2d 641, this Court relied on Acliese, supra, to affirm a defendant’s conviction for the aggravated rape of a child while she was between the ages of six and nine. In that case, the defendant was charged with a rape of the victim that had occurred in Jefferson Parish. At trial, however, the victim testified that the defendant had also raped her twice while her family lived in Monroe, Louisiana. Citing Adíese, this Court found no prejudice to the defendant in the admission of the uncharged “bad act” evidence, even though the defendant had not been provided with formal notice by the *622 State that such evidence would be introduced at trial. Id. at 535.
Similarly, in the instant case, the alleged acts of sexual abuse against C.C. by defendant, which occurred outside of Jefferson Parish and were not charged in the instant bill of information, were properly admitted at trial. At the very least, the other acts demonstrated defendant’s lustful disposition toward C.C., who he raped repeatedly over the course of several years using a similar pattern of abuse, and |]4were admissible under La. C.E. art. 412.2. Further, these acts were admissible pursuant to the Supreme Court’s holding in Adíese, supra.
For the foregoing reasons, we find defendant’s first assignment of error to be without merit.

ASSIGNMENT OF ERROR NO. TWO

Sufficiency of proof of defendant’s habitual offender status

In this assignment of error, defendant contends that the trial court erred in finding him to be a habitual offender because the State failed to sufficiently prove his habitual convictions under the burden of proof set forth in La. R.S. 15:529.1.
Following defendant’s conviction in the instant case, the State filed a habitual offender bill of information on September 20, 2012. Specifically, the underlying felony and prior convictions listed by the State included: (1) defendant’s conviction on August 21, 2012, in the Twenty-Fourth Judicial District Court, for aggravated incest, a violation of La. R.S. 14:78.1; (2) defendant’s guilty plea on December 15, 2005, in case 5:04 CR 02355-001 in the United States District Court, Southern District of Texas, to violating 8 USC 1324(a)(1)(A)(ii) and 1324(a)(l)(B)(i); (3) defendant’s guilty plea on August 13, 1992, in Orleans Parish Criminal District Court case number 357-272, to possession of cocaine and subsequent sentence as a habitual offender; and (4) defendant’s guilty plea on November 2, 1990, in the Twenty-Fourth Judicial District Court, case number 90-0334, for simple burglary, a violation of La. R.S. 14:62.
Defendant did not stipulate to the allegations in the habitual offender bill of information, and requested a habitual bill hearing. At the habitual bill hearing, the State presented evidence of defendant’s prior felony convictions. The following documents were admitted into evidence by the State without objection: (1) a certified copy of the trial transcript of defendant’s testimony at the instant trial 11figiven under oath, wherein he admitted to prior convictions for cocaine possession, burglary, and transportation of illegal aliens; (2) a certified copy of defendant’s 1990 conviction for simple burglary;[5] (3) a certified conviction for defendant’s guilty plea on August 13, 1992, in Orleans Parish Criminal District Court case number 357-272, to possession of cocaine; (4) a copy of 8 USC, Section 1324; and (5) a letter from defendant’s probation officer regarding his federal conviction from the Southern District of Texas.
After the admission of the State’s exhibits, defendant, through counsel, argued that with respect to defendant’s federal conviction, the State had not introduced any colloquy or Boykin form acknowledging that defendant was properly advised of his rights. Similarly, on appeal, defendant asserts that the State failed to prove that his prior federal conviction was lawfully obtained.
For the defendant to receive an enhanced penalty under La. R.S. 15:529.1, *623 the State must prove prior felony convictions and then prove the defendant is the same person who committed the prior felonies. State v. Blackwell, 377 So.2d 110 (La.1979); State v. Lanieux, 09-676 (La.App. 5 Cir. 3/9/10), 42 So.3d 979, 981, writ denied, 10-844 (La.11/12/10), 49 So.3d 886. Both the identity and the prior conviction alleged must be proven beyond a reasonable doubt. La. R.S. 15:529.1(D)(l)(b).
When the State relies on a prior conviction that is based on a guilty plea to prove defendant’s habitual offender status and defendant denies the habitual bill’s allegations, the State bears the burden of proving the existence of the prior guilty plea and that the defendant was represented by counsel when it was taken. State v. Shelton, 621 So.2d 769, 779-80 (La.1993). If the State meets this burden, the defendant must produce affirmative evidence of an infringement of his rights or of |1fia procedural irregularity. Lanieux, supra. If the defendant meets this burden, the burden shifts back to the State to prove the constitutionality of the plea, that is, that the plea was knowing and voluntary. Id.
With respect to all of defendant’s prior felony convictions, including for his federal offense, the State offered the sworn testimony of defendant admitting the same, both during trial and during the habitual offender hearing. The trial court could properly take those admissions into account in finding that the State thus presented sufficient proof at the habitual offender hearing that defendant was the same person who had pled guilty to the predicate offenses. State v. Brown, 11-1656 (La.2/10/12), 82 So.3d 1232, 1234; State v. Jones, 332 So.2d 461, 462 (La.1976) (A trial judge may take judicial notice during habitual offender proceedings “of any prior proceeding which was a part of the same case he had previously tried.”) (internal quotation marks and citation omitted).
Prior to the habitual offender hearing, defendant also acknowledged that he was represented by counsel for his federal guilty plea, although he could not recall his attorney’s name. Further, without objection by defendant, the State offered into evidence a letter prepared by Probation Officer Rodney Douglas,[6] stating that defendant was convicted in federal court on December 6, 2005, and recounting the sentence that defendant received. The letter stated that defendant was convicted on December 6, 2005, and was sentenced thereafter to 12 months and one day in the custody of the United States Bureau of Prisons, followed by a three-year term of supervised release. Attached to that letter was an uncertified copy of a Judgment from the United States District Court, Southern District of Texas, dated December 15, 2005, which indicated that defendant pled guilty to a violation of 8 U.S.C. 117sections 1324(a)(l)(A)(ii) and 1324(a)(l)(B)(i) in case 5:04CR02355-001 on January 19, 2005, and was represented by attorney Valeria Acevedo. The document bears the signature of United States District Judge, George P. Kazen.
The Habitual Offender Law, La. R.S. 15:529.1, does not require the State to use any specific type of evidence in order to carry its burden of proof. The defen *624 dant’s prior convictions may be proven by any competent evidence. State v. Payton, 00-2899 (La.3/15/02), 810 So.2d 1127, 1132.
Upon review, we find that the trial transcript admitting the federal conviction, the admission that he was represented by an attorney upon entering that guilty plea, and the letter from the probation officer and attached documents, were sufficient for the State to meet its initial burden under Shelton, supra. Thereafter, defendant failed to produce affirmative evidence of an infringement of his rights or of a procedural irregularity with respect to his federal conviction. Consequently, the burden never shifted back to the State to prove the constitutionality of the federal predicate plea. Lanieux, supra; State v. Payne, 40-46, 47 (La.App. 5 Cir. 1/26/11), 59 So.3d 1287. Accordingly, we find the trial court did not err in finding defendant to be a fourth felony offender.
For the foregoing reasons, we find defendant’s second assignment of error to be without merit.

ERRORS PATENT REVIEW

Defendant requests an errors patent review. However, this Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), regardless of whether defendant makes such a request.
First, we note that although the commitment reflects that defendant was given an advisal regarding the time period for seeking post-conviction relief, the transcript indicates that the trial court failed to provide defendant with an advisal of |)8the time limitation provided in La.C.Cr.P. art. 930.8. The transcript prevails when there is a disci’epancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).
It is well settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La.C.Cr.P. art. 930.8, this Court may correct said error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, writ denied, 11-1753 (La.2/10/12), 80 So.3d 468. Accordingly, by means of this opinion, we inform defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. C.Cr.P. art. 914 or 922.
Next, when sentencing defendant as a habitual offender, the trial judge imposed a fine of $25,000.00. The habitual offender statute, La. R.S. 15:529.1, does not authorize the imposition of a fine, but only provides for enhanced sentences relating to the term of imprisonment. State v. Dickerson, 584 So.2d 1140 (La.1991). Accordingly, defendant’s sentence is hereby amended to delete the fine. State v. Marshall, 45,567 (LaApp. 2 Cir. 9/22/10), 47 So.3d 1083, writ denied, 10-2411 (La.2/25/11), 58 So.3d 457. As amended, defendant’s sentence is hereby affirmed.
Finally, defendant was charged with and convicted of La. R.S. 14:78.1, aggravated incest, a “sex offense” as defined by La. R.S. 15:541, which necessitates registration under La. R.S. 15:540, et seq. However, the record indicates that the trial judge did not provide written notification of the registration requirements of La. R.S. 15:542 as required by La. R.S. 15:543(A). Accordingly, this matter is remanded and the trial court is ordered to inform defendant of the | ^registration requirements of La. R.S. 15:542 by sending appropriate *625 written notice to him within ten days of the rendition of this opinion, and to file written proof in the record that defendant has received such notice. State v. Alvarez, 10-925 (La.App. 5 Cir. 6/29/11), 71 So.3d 1079, 1086.

CONCLUSION

For the foregoing reasons, defendant’s conviction of aggravated incest and his adjudication as a fourth felony offender are affirmed. Defendant’s sentence is amended to delete the fine, and his 75-year sentence is affirmed as amended. This matter is remanded to the trial court for the limited purpose of sending written notice of the registration requirements of La. R.S. 15:542 to defendant.

CONVICTION AFFIRMED; SENTENCE AMENDED AND AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS

. On February 19, 2013, the Judges of this Court adopted a policy wherein this Court, in its published work, observing the principle of protecting minor victims and victims of sexual offenses set forth in La. R.S. 46:1844(W)(3), will identify, by initials only, the victim and defendant or witnesses whose names can lead to the victim's identity, i.e., parent, sibling, or relative with the same last name as the victim. Compare State v. R.W.B., 12-453 (La.12/4/12), 105 So.3d 54.

. Dr. Chau explained that the infant had poly-cystic kidney disease in both kidneys, an abnormal heart, and little lung development due to a lack of amniotic fluid. Dr. Chau stated that the infant's medical condition could be attributed, in part, to both parents sharing a "silent” or "recessive” gene for the disease. Each time that parents share similar DNA, the baby has a 25% risk of having the disease.

. Defendant explained to the jury that he was “built like a race horse. If I’d have did [sic] anything to a twelve year old, she’d be walking with her legs in parenthesis for the rest of her life.”

. 277 So.2d 126 (La.1973).

. The State asked for and was given leave to amend the habitual offender bill of information on this charge from November 2, 1990 to November 27, 1990.

. The State can also establish identity by having someone like a probation officer come in and testify from personal knowledge that the defendant is the same person he previously supervised after the prior conviction. See State v. DeSalvo, 98-353 (La.App. 5 Cir. 10/14/98), 721 So.2d 938, 942, writ denied, 98-2828 (La.2/26/99), 738 So.2d 1067 (parole officer’s testimony and identification of the defendant was deemed sufficient to prove identity).